GAIDRY, J.
 

 |?iThe defendant, Lezric Cardell Morris, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1. He pleaded not guilty. Following a jury trial, he was found guilty as charged. He filed motions for a new trial, a postverdict judgment of acquittal, and in arrest of judgment, but his motions were denied. Defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. He now appeals, designating the following two assignments of error:
 

 1. The jury did not act as a reasonable one in rejecting a manslaughter verdict. A nineteen[-]year[-]old’s “heat of passion” and subjective belief in his right to self defense against “crowding” should have been considered as mitigating elements to a murder charge.
 

 2. Counsel was ineffective in failing to request a jury charge on the “imperfect right of self-defense” and the definition of “confrontation” and in failing to object to the incomplete and erroneous charges relating to justifiable homicide. The charges, as given by the trial judge and not objected to by counsel[,] were incomplete and erroneous statements of the law that led to an irrational verdict which should be set aside. Due [p]ro-cess considerations mandate that the incomplete jury charge be subject to review.
 

 For the following reasons, we affirm the conviction and sentence.
 

 FACTS
 

 The victim, Cory Turner, died after being shot seven times on the afternoon of August 29, 2007. He was nineteen years old and was killed two days before his twin sons’ first birthday. The events culminating in his death began during the early morning hours approximately two or three days earlier.
 

 The victim, his cousin Ezekiel “Buckwheat” Turner, defendant, and defendant’s mother, Sheryl Morris, all lived in a close-knit neighborhood around Keith Street in Walker, Louisiana. It was common for residents to walk about the neighborhood in the afternoon.
 

 | sApproximately two days before the victim’s killing, at approximately 3:00 a.m., defendant’s mother, Sheryl, and some friends had returned to the neighborhood from a Hammond nightclub and were being noisy. Ezekiel
 
 [1]
 
 told Sheryl and some of her friends to be quiet and to leave in their automobile.
 

 The next day, a verbal argument ensued between Ezekiel and Sheryl after Sheryl made an obscene gesture (“flipped the bird”) at Ezekiel as she passed by as a passenger in a car. Defendant happened to be walking down the street, observed the confrontation, and began punching Ezekiel and “stomp[ing] him.” Ezekiel was recovering from surgery and weighed approximately 130 pounds at the time. According to Qunetta Stewart, a cousin of
 
 *1005
 
 Ezekiel and the victim, the victim approached and confronted defendant, telling him, “[D]on’t hit my cousin like that because he’s sick,” and then punched defendant in the face, knocking him to the ground. After the victim struck defendant, Sheryl assisted defendant into the car and they drove away. The police arrived at the scene, but Ezekiel did not file a complaint against defendant. Ezekiel explained at trial that he did not want to get defendant into trouble because he understood that defendant was angry and that his motivation was to defend his mother from verbal abuse. He also indicated that he called the victim the next day and told him, “Just let all of that slide[,]” and the victim expressed his agreement.
 

 According to the victim’s mother, Sonya Latrice Turner, after the incident during which he punched defendant, the victim stayed at her house and did not go out that night. The victim spent the next day in Baton Rouge making music with his cousin Keefer, a rapper, and Keefer’s rap partner. On the day of the killing, Sonya picked up the victim and Keefer at Keefer’s home |4in Baton Rouge and returned to Walker. She dropped them off so that the victim could visit another friend, Keon Grayer, for an hour. Keon was then on Brown Street, walking home, so Sonya dropped the victim and Keefer off on Brown Street, and last saw the victim alive as he walked with Keefer and Keon toward Keon’s house. After Sonya had driven only a short distance away, Keon called her on her cellular telephone and told her that the victim had been shot. Sonya found the victim with multiple gunshot wounds, lying on the ground near Antoine “Muppy” Grayer’s house trailer.
 

 Antoine testified at trial that both defendant and the victim were his cousins. Antoine’s house trailer was situated across the street from the house trailer of defendant’s grandmother, but also faced defendant’s trailer. On the day of the shooting, Antoine observed defendant standing outside his trailer talking on a cellular telephone. He then saw defendant look down the street and heard him say to the other person on the telephone, “Hold on. I gotta handle some business.” Defendant then entered his trailer. Thereafter, the victim, Keon Grayer, Albert Watson, and another person named “Timothy” came walking down the street. The group entered Antoine’s yard, and the victim invited Antoine to a birthday party for his twin sons. The victim and his friends then left Antoine’s property and began walking toward Keon’s home.
 

 Antoine testified that defendant exited his trailer as the victim and his friends were walking in front of a school next to Antoine’s property. Defendant “beckon[ed]” the victim and his friends to approach him. The victim’s friends “grabbled]” him in an effort to discourage him from approaching defendant. The victim and defendant then “squared up like they were [going to] fight,” and defendant produced a gun from under the front of his shirt and shot the victim. The victim tried to run away, but was only able |fito crawl into Antoine’s yard as defendant continued to shoot him. Antoine recalled that defendant fired more than five times and only fired at the victim. Defendant then ran back to his trailer. Antoine did not see anything in the victim’s hands during the encounter. According to Antoine, the victim never went onto defendant’s property and never spoke to defendant before defendant beckoned him.
 

 Austin Shane Grayer, Antoine’s brother, also witnessed the shooting. Austin recalled that the victim and Keon were walking down the street while defendant was in his yard conversing on a cellular telephone. The victim spoke to Austin, but
 
 *1006
 
 then the victim and Keon went back up the street to help Austin’s uncle carry something into his home. After the victim and Keon left to assist Austin’s uncle, defendant stated on his telephone, “I’m gonna call you back[,]” and walked into his trailer. The victim and Keon walked back down the street after helping Austin’s uncle and stopped in front of Austin’s trailer. According to Austin, defendant walked over to the victim “like he was about to hit him.” Austin thought the victim and defendant were about to fight because it appeared that “[the victim] wasn’t gonna back down.” Austin heard the victim state, “What’s up?,” and “Well, what you want to do?” to defendant. According to Austin, defendant then pulled out a gun and started shooting as the victim “was about like to swing on [the defendant].”
 

 The victim tried to run into Austin’s yard, but tripped over a flower bed. Defendant tried to stand over the victim as he continued shooting him, but the victim kept trying to crawl away. Austin recalled approximately nine gunshots.
 

 Keon Grayer testified that he was a friend of both the victim and defendant. He first saw the victim on the day of the shooting at Jarvis Parker’s house after Sonya returned from Baton Rouge and dropped the victim off. | f,Parker was the victim’s cousin. Keon recalled that the victim, Parker, and Keon then walked down to Antoine’s house, and the victim informed Antoine about the birthday party for the victim’s sons. The victim and Keon then continued walking towards Keon’s home. Parker went back up the street to meet his stepfather, Albert Watson, and Timothy Harris. The victim and Keon also walked back up the street after noticing that Parker was going to meet Watson and Harris. Eventually, Parker, Watson, Harris, the victim, and Keon made their way on the street to the vicinity of Antoine’s house. Defendant then walked out of his yard and approached the victim. Keon explained, “It looked like they were gonna fight. And [defendant] came out with the gun and shot him.” According to Keon, defendant began shooting after the victim began to run away and tripped. Defendant then fired his gun at the victim as he tried to crawl away. Defendant fired until the weapon’s “clip” was empty.
 

 Albert Watson testified that he was married to the victim’s cousin. According to Watson, he, the victim, and Timothy Harris had passed defendant’s trailer when the defendant came out, approached the victim, and stated, “You punched me in my eye.” The victim replied, “Well, what’s up?,” and assumed a fighting stance. Defendant then began shooting the victim. The victim was hit by the first shot and, in Watson’s words, “was like cripple and crawlin’.”
 

 Ariel Mack testified that she was a cousin of the victim and had previously been defendant’s girlfriend. On the day that the victim punched the defendant, Mack went home with her aunt, Ella Turner, accompanied by the victim. Later, defendant called Mack on her cellular telephone. Defendant told her that he wanted to speak with the victim, but Mack refused at first to put the victim on the telephone. Defendant insisted that he wanted to “meet up with [the victim].” The victim then spoke to defendant on the telephone, but |7did not leave the home. Defendant called Mack approximately three more times that evening, wanting to know if the victim was “gonna meet with him.” Defendant told Mack that he “felt played.” Asked to explain the meaning of that expression, Mack stated, “I guess he felt like he lost the fight, so he wanted to retaliate.”
 

 Defendant also telephoned Mack after shooting the victim. Mack testified that
 
 *1007
 
 she had learned of the victim’s death and was crying while on the telephone, and defendant then said he was sorry and had not intended to hurt her. Mack pleaded for defendant to turn himself in, and he said he would do so. Mack asked defendant for his location three times, but he would not reveal that information to her.
 

 Yolanda Collier testified that she was defendant’s aunt. On the day of the shooting, she telephoned her cousin, Lesha Collier, and told her about the shooting. Yolanda also spoke to defendant on the telephone. She informed him that the victim had died. Defendant replied, “Oh, man, he did?” Yolanda then told defendant, “You throw your life away.” Defendant replied, “I know.” Yolanda asked defendant why he had done it, to which he replied, “I felt played.”
 

 With regard to the initial incident between defendant and the victim, defendant’s mother, Sheryl Morris, claimed that the victim ran out from nearby woods and hit the defendant “with something.” She conceded, however, that she never actually observed the victim with an object in his hand. Sheryl claimed that the subsequent shooting of the victim was preceded by telephone calls from the victim to defendant threatening to “crowd” him (attack him with multiple assailants) and, shortly before the killing, by her daughter alerting the defendant that, “They [the victim and friends] cornin’ around here to pick.” She claimed that she attempted to follow defendant as | Rhe rushed out of the trailer, but that by the time she dressed herself and exited, the shooting was over. She also claimed that defendant “never had a gun.”
 

 On rebuttal, Keefer Johnson explained that there were no woods in the area of the initial incident between defendant and the victim and that, on the day of the shooting, there had been no plan to fight defendant and no telephone calls made by the victim or Keefer to defendant.
 

 Defendant was apprehended in Baton Rouge, approximately eighteen hours after the shooting. The gun he used to kill the victim was never recovered. The state and the defense stipulated that five shell casings recovered at the scene were all fired by the same 9 millimeter weapon.
 

 SUFFICIENCY OF THE EVIDENCE
 

 In his first assignment of error, citing
 
 State v. Lombard,
 
 486 So.2d 106 (La.1986), defendant argues that he was entitled to a manslaughter verdict because he established by a preponderance of the evidence that he acted in a “sudden passion” or “heat of blood.” He also argues that the jury was irrational to return a murder verdict, rather than a manslaughter verdict, because the victim was the original aggressor and he (defendant) could have rationally, even if incorrectly, believed that he had a right to defend himself against what he perceived as a gang attack.
 

 The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime and the defendant’s identity as the perpetrator of that crime beyond a reasonable doubt. In conducting this review, we also must be expressly mindful of Louisiana’s circumstantial evidence test, which states in part that, “assuming every fact to be proved that the evidence tends to prove,” in order to convict, every reasonable hypothesis of innocence is excluded.
 
 State v. Wright,
 
 98-0601, p. 2 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486,
 
 writs denied,
 
 99-0802 (La.10/29/99), 748 So.2d 1157, 00-0895 (La.11/17/00), 773 So.2d 732 (quoting La. R.S. 15:438).
 

 
 *1008
 
 When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.
 
 Wright,
 
 98-0601 at p. 3, 730 So.2d at 487.
 

 SECOND DEGREE MURDER
 

 Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant’s actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder.
 
 State v. Henderson,
 
 99-1945, p. 3 (La.App. 1st Cir.6/23/00), 762 So.2d 747, 751,
 
 writ denied,
 
 2000-2223 (La.6/15/01), 793 So.2d 1235. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person.
 
 Id.
 

 In
 
 State v. Mitchell,
 
 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83, the Louisiana Supreme Court set forth the following precepts for appellate review of circumstantial evidence in connection with review of the sufficiency of the evidence:
 

 On appeal, the reviewing court “does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.” Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently
 
 reasonable
 
 that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 

 The jury is the ultimate factfinder of “whether a defendant proved his condition and whether the state negated that defense.” The reviewing court “must not impinge on the jury’s factfinding prerogative in a criminal case except to the extent necessary to guarantee constitutional due process.”
 

 (Citations omitted).
 

 Further, the
 
 Mitchell
 
 Court cautioned:
 

 “The actual trier of fact’s
 
 rational
 
 credibility calls, evidence weighing, and inference drawing are preserved ... by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt.” The reviewing court is not called upon to determine whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Rather, the court must assure that the jurors did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt. The reviewing court cannot substitute its idea of what the verdict should be for that of the jury. Finally, the “appellate court is constitutionally precluded from acting as a ‘thirteenth juror’ in assessing what weight to give evidence in criminal cases; that determi
 
 *1009
 
 nation rests solely on the sound discretion of the trier of fact.”
 

 Mitchell,
 
 99-3342 at p. 8, 772 So.2d at 83 (citations omitted).
 

 An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury.
 
 State v. Calloway,
 
 07-2306, pp. 1-2 (La.1/21/09), 1 So.3d 417, 418 (per curiam).
 

 JnSELF-DEFENSE AND AGGRESSOR DOCTRINE
 

 When a defendant charged with a homicide claims self-defense, the State has the burden of establishing beyond a reasonable doubt that he did not act in self-defense.
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986).
 

 Louisiana Revised Statutes 14:20(A), in pertinent part, provides:
 

 A homicide is justifiable:
 

 (1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
 

 However, La. R.S. 14:21 qualifies the foregoing by providing:
 

 A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.
 

 The relevant inquiry on appeal is whether or not, after viewing the evidence in the light most favorable to the prosecution, a rational fact finder could have found beyond a reasonable doubt that the defendant did not act in self-defense.
 
 Rosiere,
 
 488 So.2d at 968-69;
 
 see also State v. Wilson,
 
 613 So.2d 234, 238 (La.App. 1st Cir.1992),
 
 writ denied,
 
 93-0533 (La.3/25/94), 635 So.2d 238.
 

 MANSLAUGHTER
 

 Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31 A(l). “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the | ^homicide is committed without them. The state does not bear the burden of proving the absence of these mitigatory factors. A defendant who establishes by a preponderance of the evidence that he acted in a “sudden passion” or “heat of blood” is entitled to a manslaughter verdict. In reviewing the claim, the court must determine if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigatory factors were not established by a preponderance of the evidence.
 
 State v. Huls,
 
 95-0541, pp. 26-27 (La.App. 1st Cir.5/29/96), 676 So.2d 160, 177,
 
 writ denied,
 
 96-1734 (La.1/6/97), 685 So.2d 126, reconsideration denied, 96-1734 (La.3/21/97), 691 So.2d 71.
 

 STATE v. LOMBARD
 

 Lombard,
 
 486 So.2d at 107, involved an appeal from a conviction for the second degree murder of the victim, John St. Pierre. The defendant, the victim, and the victim’s girlfriend were spectators at a football game. The defendant harassed the girlfriend as she walked past him on
 
 *1010
 
 her way to and from the bathroom. The girlfriend disclosed the harassment to the victim, and the victim threatened to kill the defendant if he said anything else to her. The defendant immediately retorted that he would say something to the girlfriend. The victim warned the defendant that if anything remained to be settled, he would be back later. The defendant told a few bystanders that if the victim returned, there would not be much of a fight because the defendant had a knife, which he would use. The victim and his girlfriend passed the defendant without incident as they left the game, but following an argument, the victim challenged the defendant to fight him in the parking lot. The defendant refused the invitation, making an obscene gesture. The victim responded with the statement “[T]hat’s your ass,” handed his glasses to his girlfriend and moved toward the defendant. The victim threw the first | isblow, grabbed the defendant and hurled him against a railing, and wrapped his right arm around the defendant’s neck in a stranglehold while twisting the defendant’s left arm behind his back. The defendant used his right hand to remove his knife from his pocket, flick off the sheath, and stab the victim twice.
 
 Lombard,
 
 486 So.2d at 107-08.
 

 The court in
 
 Lombard
 
 found that the jury erred in finding the defendant guilty of second degree murder, rather than manslaughter, because a preponderance of the evidence clearly showed that the defendant committed the offense in a sudden passion or heat of blood caused by a provocation which would have deprived an average person of his self-control and cool reflection, and no rational trier of fact could have concluded otherwise.
 
 Lombard,
 
 486 So.2d at 111.
 

 We conclude that
 
 Lombard
 
 is factually distinguishable from the instant case.
 
 See State v. Clark,
 
 93-2090, pp. 4-5 (La.App. 4th Cir.5/17/94), 637 So.2d 1140, 1142-43 (declining to reverse based on
 
 Lombard
 
 where no evidence was presented that the victim was carrying a gun or was actively threatening the defendant when the fatal shot was fired).
 

 After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant’s identity as the perpetrator of that offense against the victim, Cory Turner. The verdict rendered against the defendant demonstrates that the jury accepted the testimony offered against the defendant and rejected the testimony offered in his favor. As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness.
 
 State v. Johnson,
 
 99-0385, p. 9 (La.App. 1st Cir.11/5/99), 745 So.2d 217, 223,
 
 writ denied,
 
 2000-0829 (La.11/13/00), 774 So.2d 971. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder’s determination of guilt.
 
 State v. Glynn,
 
 94-0332, p. 32 (La.App. 1st Cir.4/7/95), 653 So.2d 1288, 1310, writ denied, 95-1153 (La.10/6/95), 661 So.2d 464. In reviewing the evidence, we cannot say that the jury’s determination was irrational under the facts and circumstances presented to them.
 
 See State v. Ordodi,
 
 06-0207, p. 14 (La.11/29/06), 946 So.2d 654, 662.
 

 Further, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could find that the evidence presented by the State established that the defendant was the aggressor in the conflict and, thus, was not entitled to claim self-defense. Moreover,
 
 *1011
 
 even if it could be found that the defendant was not the aggressor, any rational trier of fact could find, beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant did not act in self-defense. Testimony at trial indicated that following the initial incident with the victim, defendant “felt played,” made numerous attempts to “meet up with” or confront the victim, and ultimately armed himself, confronted the unarmed victim, and shot him to death as he tried to crawl away. Defendant then fled the scene and disposed of the weapon. Defendant’s flight from the scene after the incident was also inconsistent with a theory of justifiable homicide.
 
 See State v. Wallace,
 
 612 So.2d 183, 191 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1253 (La.1993).
 

 Additionally, the verdict rendered against defendant shows that the jury rejected the defense theory that the victim, rather than defendant, was the aggressor in this case. When a case involves circumstantial evidence and the jury reasonably rejects the hypotheses of innocence presented by the defense, 115those hypotheses fall, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.
 
 See State v. Moten,
 
 510 So.2d 55, 61 (La.App. 1st Cir.),
 
 writ denied,
 
 514 So.2d 126 (La.1987). No such hypothesis exists in the instant case.
 

 A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could also have found that the mitigatory factors required to support manslaughter were not established by a preponderance of the evidence.
 

 This assignment of error is without merit.
 

 INEFFECTIVE ASSISTANCE OF COUNSEL
 

 In his second assignment of error, defendant argues that his defense counsel was ineffective in failing to request that the jury be charged on the imperfect right of self-defense and La. R.S. 14:20(A)(2); and was ineffective in failing to object, under La. R.S. 14:20(D), to the charge: “And some factors you should consider in determining whether the defendant had a reasonable belief that the killing was necessary are: (1) the possibility of avoiding the necessity of taking a human life by retreat[.]”
 

 Initially, we note that defense counsel did not object to the proposed jury charges. Normally, such failure to object would preclude consideration on appeal of arguments challenging the giving or failure to give a jury charge.
 
 See
 
 La.C.Cr.P. arts. 801(C) and 841(A). However, in order to address the claim of ineffective assistance of counsel, it is appropriate to address the arguments concerning the jury charges.
 
 See State v. Cooper,
 
 05-2070, pp. 8-9 (La.App. 1st Cir.5/5/06), 935 So.2d 194, 199,
 
 writ denied,
 
 06-1314 (La.11/22/06), 942 So.2d 554.
 

 A claim of ineffective assistance of counsel is generally relegated to post-conviction proceedings, unless the record permits definitive resolution on L appeal.
 
 State v. Miller,
 
 99-0192, p. 24 (La.9/6/00), 776 So.2d 396, 411,
 
 cert. denied,
 
 531 U.S. 1194, 121 S.Ct. 1196, 149 L.Ed.2d 111 (2001). A claim of ineffectiveness of counsel is analyzed under the two-pronged test developed by the United States Supreme Court in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish that his trial attorney was ineffective, the defendant must first show that the attorney’s performance was deficient, which requires a showing that counsel made errors so serious that he was not functioning as counsel guaranteed by the Sixth Amendment.
 
 *1012
 
 Secondly, the defendant must prove that the deficient performance prejudiced the defense. This element requires a showing that the errors were so serious that the defendant was deprived of a fair trial; the defendant must prove actual prejudice before relief will be granted. It is not sufficient for defendant to show that the error had some conceivable effect on the outcome of the proceeding. Rather, he must show that but for his counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. Further, it is unnecessary to address the issues of both counsel’s performance and prejudice to the defendant if the defendant makes an inadequate showing on one of the components.
 
 State v. Serigny,
 
 610 So.2d 857, 859-60 (La.App. 1st Cir.1992),
 
 writ denied,
 
 614 So.2d 1263 (La.1993).
 

 Louisiana Code of Criminal Procedure article 807 provides:
 

 The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
 

 A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is 117included in the general charge or in another special charge to be given.
 

 IMPERFECT RIGHT OF SELF-DEFENSE
 

 The theory of the imperfect right of self-defense acknowledges that there are homicides which fall short of self-defense, but holds that those homicides should not constitute murder, where the defendant’s honest but erroneous belief of imminent harm is less than reasonable. Louisiana law does not provide for any mitigating circumstance resembling the theory of “imperfect self-defense.”
 
 See State v. Johnson,
 
 98-1407, pp. 7-8 (La.App 1st Cir. 4/1/99), 734 So.2d 800, 805-06,
 
 writ denied,
 
 99-1386 (La.10/1/99), 748 So.2d 439.
 

 Defense counsel did not perform deficiently in failing to request that the jury be charged on the imperfect right of self-defense. The court would not have given such a charge because it would not be the law applicable to the case and would not be wholly correct and pertinent.
 
 See
 
 La.C.Cr.P. arts. 802(1) and 807.
 

 Defense counsel also did not perform deficiently in failing to request that the jury be charged on the provisions of La. R.S. 14:20(A)(2).
 
 [2]
 
 The court charged the jury on La. R.S. 14:20(A)(1), which was consistent with the defense theory that the killing was “committed in self-defense by one who reasonably believe[d] that he [was] in imminent danger of losing his life or receiving great bodily harm and that the killing [was] necessary to save himself from that danger.”
 

 | iSLouisiana Revised Statutes 14:20(D) was added to the statute as part of a
 
 *1013
 
 revision deleting language providing that “[t]he homicide shall be justifiable even though the person does not retreat from the encounter” from La. R.S. 14:20(A)(S) (justifiable homicide committed by a person in a dwelling, place of business, or motor vehicle during burglary or robbery); deleting language providing that “[t]he homicide shall be justifiable even though the person committing the homicide does not retreat from the encounter” from La. R.S. 14:20(A)(4)(a) (justifiable homicide committed by a person in a dwelling, place of business, or motor vehicle to prevent entry or to compel the intruder to leave); and adding La. R.S. 14:20(B), (C), and (D).
 
 See
 
 Acts 2006, No. 141,
 

 Louisiana Revised Statutes 14:20(B), (C), and (D) provide:
 

 B. For the purposes of this Section, there shall be a presumption that a person lawfully inside a dwelling, place of business, or motor vehicle held a reasonable belief that the use of deadly force was necessary to prevent unlawful entry thereto, or to compel an unlawful intruder to leave the premises or motor vehicle, if both of the following occur:
 

 (1) The person against whom deadly force was used was in the process of unlawfully and forcibly entering or had unlawfully and forcibly entered the dwelling, place of business, or motor vehicle.
 

 (2) The person who used deadly force knew or had reason to believe that an unlawful and forcible entry was occurring or had occurred.
 

 C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using deadly force as provided for in this Section, and may stand his or her ground and meet force with force.
 

 D.No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used deadly force had a reasonable belief that deadly force was reasonable and apparently necessary to prevent a violent or forcible felony involving life or great bodily harm or to prevent the unlawful entry.
 

 | ^Louisiana Revised Statutes 14:20(A) sets forth situations when a homicide may be justifiable depending on the reasonable belief of the person committing the homicide, the danger presented to that person or others, and the need for the use of deadly force. While La. R.S. 14:20(C) provides that there is “no duty to retreat before using deadly force,” that statement is limited by the language “as provided for in this Seetion[.]” Louisiana Revised Statutes 14:20(D) prohibits consideration of the possibility of retreat by the fact finder, but in doing so, tracks the language of La. R.S. 14:20(A)(2) (“When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm ...”) and La. R.S. 14:20(A)(4)(a) (“When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40), against a person who is attempting to make an unlawful entry ... ”). In order for La. R.S. 14:20(A)(2) to apply, “[t]he circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.” Louisiana Revised Statutes 14:20(A)(4)(a) only applies when “the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the premises or motor vehicle.”
 

 Moreover, even assuming for the sake of argument that defense counsel
 
 *1014
 
 performed deficiently in failing to object to the court’s reference to retreat in its charge in light of La. R.S. 14:20(D), defendant would still have to satisfy the second prong of his claim of ineffective assistance of counsel. A conviction will not be overturned on the grounds of an erroneous jury charge unless the disputed portion, when considered in connection with the remainder of the charge, is erroneous and prejudicial. An erroneous instruction is subject |2nto harmless error review or, in the case of an ineffective assistance of counsel claim, an analysis of whether the defendant was prejudiced by the error. The question becomes whether it appears beyond a reasonable doubt that the erroneous instruction did not contribute to the jury’s finding of guilt or whether the error is unimportant in relation to everything else the jury considered, as revealed in the record. Stated another way, the appropriate standard for determining harmless error is whether the guilty verdict was surely unattributable to the jury charge error.
 
 Cooper,
 
 05-2070 at p. 9, 935 So.2d at 199-200.
 

 Even assuming the trial court erred in referencing retreat in its jury charge, considering the evidence presented herein and the trial court’s instructions as a whole, the verdict was surely unattributable to any such error. There was no evidence even remotely suggesting that defendant shot the victim while defendant was inside a dwelling, place of business, or a motor vehicle, and the victim had as much right to be in the area where he was killed as did the defendant. It was also undisputed that the victim attempted to flee from defendant as soon as defendant produced the handgun, and that defendant repeatedly shot the victim as he tried to crawl away and escape. Thus, we find that the retreat portion of the jury charge in question, even if erroneous, certainly did not prejudice the defendant.
 

 This assignment of error is without merit.
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 McCLENDON, J., concurs. I agree with the result reached by the majority.
 

 [2]
 

 . Louisiana Revised Statutes 14:20(A)(2) provides that a homicide is justifiable "[wjhen committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention.” To invoke this provision, "[t]he circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.”