STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2024 KA 0257

STATE OF LOUISIANA

VERSUS

DAYVON BENTLEY

Judgment Rendered: **NOV 1 3 2024**

* * * * *

On Appeal from the
19th Judicial District Court
Parish of East Baton Rouge, State of Louisiana
Trial Court No. 21-00248

The Honorable William Jorden, Judge Presiding

* * * * *

Hillar C. Moore, III
District Attorney
Jessica Fogan
Assistant District Attorney
Baton Rouge, Louisiana

Attorneys for Appellee,
State of Louisiana

Prentice L. White
Louisiana Appellate Project
Baton Rouge, Louisiana

Attorney for Defendant-Appellant,
Dayvon Bentley

* * * * *

BEFORE: WOLFE, MILLER, AND GREENE, JJ.

**WOLFE, J.**

The defendant, Dayvon Bentley, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty.[1] After a jury trial, he was found guilty as charged. The trial court denied the defendant's motion for new trial or, alternatively, post-verdict judgment of acquittal, and sentenced the defendant to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error to the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

On September 16, 2020, officers with the Baton Rouge Police Department (BRPD) responded to a shooting at 2944 Joyce Drive, after several 911 callers reported the incident. When the police arrived, three children, Damien, Breonta, and Devonta Sims, ran towards them saying their mother, Brenda Mullens, had been shot.[2] The children identified the shooter as the defendant, their mother's former boyfriend, known to them as "Juice Bentley."

According to the children, the defendant called Mullens about twenty minutes before arriving at the house. Once he arrived, Mullens told Damien, the eldest child in the home, to get a gun, opened the wooden front door, but kept the metal screen door closed. She talked to the defendant briefly, then closed the door. Seconds later, multiple gunshots were fired through the front door, and Mullens fell to floor. Damien called the police, went outside, returned gunfire, and then went back inside.

---

[1] The defendant's first name is interchangeably spelled "Dayvon" and "Davyon" throughout the record. In this opinion, we use Dayvon, the spelling consistent with the defendant's counseled appeal brief.

[2] Damien testified that his full name is Damien Sims, Jr.; he was nineteen years old at the time of the trial and sixteen years old when the offense occurred. Twins Breonta and Devonta were thirteen years old at the time of the trial and eleven years old at the time of the offense. The children will be referenced herein by their first names in order to distinguish them, as they share the same last name.

After being interviewed at the scene, the children were taken to the police station where they positively identified the defendant in separate photographic lineups. Mullens was transported to the hospital and died from multiple gunshots wounds to her arm and chest. Detectives obtained an arrest warrant for the defendant, who was eventually arrested for the second degree murder of Mullens.

## SUFFICIENCY OF THE EVIDENCE

In his sole assignment of error, the defendant argues the evidence was insufficient to support the conviction of second degree murder. He claims the State failed to adequately prove the identity of the shooter. Alternatively, he argues the evidence supported a verdict of manslaughter.[3]

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982. When the identity of the perpetrator is at issue, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. **State v. Bessie**, 2021-1117

---

[3] The defendant also states in his brief it was "reasonable for [him] to be prepared to protect himself" on the night in question and "more probable" that he acted in self-defense. However, he fails to otherwise address the issue or state the applicable law and relevant jurisprudence. Therefore, considering the defendant's failure to present any argument in support of his claim of self-defense or brief the matter, the issue is deemed abandoned and this court need not consider it. Uniform Rules of Louisiana Courts of Appeal, Rule 2-12.4(B)(4). Further, the defendant did not raise self-defense at trial, nor was the jury instructed on self-defense. Finally, based on our review of the evidence, the jury could have rationally concluded the defendant was the aggressor, and thus, was precluded from claiming self-defense in this case. See La. R.S. 14:21; **State v. Morris**, 2009-0422 (La. App. 1st Cir. 9/11/09), 22 So.3d 1002, 1010.

3

(La. App. 1st Cir. 4/8/22), 342 So.3d 17, 23, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **Currie**, 321 So.3d at 982. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Southall**, 2022-0746 (La. App. 1st Cir. 6/2/23), 369 So.3d 925, 930, writ denied, 2023-00875 (La. 2/6/24), 378 So.3d 750.

Second degree murder is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the offense and the defendant's actions. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **State v. Livous**, 2018-0016 (La. App. 1st Cir. 9/24/18), 259 So.3d 1036, 1040, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130. Specific intent is an

4

ultimate legal conclusion to be resolved by the factfinder. **Southall**, 369 So.3d at 930.

Manslaughter is defined, in pertinent part, as a homicide that would either be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). The existence of "sudden passion" and "heat of blood" are not elements of the offense but rather, are factors in the nature of mitigating circumstances that may reduce the grade of homicide. **State v. Mellion**, 2021-1116 (La. App. 1st Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022). A defendant who claims provocation as a means of reducing murder to manslaughter has the burden of establishing the mitigating factors of sudden passion or heat of blood by a preponderance of the evidence. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 774, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242.

Provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control. **Anthony**, 378 So.3d at 771. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. **Mellion**, 342 So.3d at 45. If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. **Anthony**, 378 So.3d at 771.

At trial, the State presented testimony to show the defendant had a history of domestic disputes. Specifically, the State introduced evidence of prior domestic disturbances in 2019 and 2020, including a prior unrelated shooting incident that

occurred on July 12, 2020. In the 2020 shooting incident, the complainant called 911 after the defendant kicked down her door and fired gunshots into her apartment.

In the instant shooting, all three children who were present during the shooting at the home were interviewed first at the scene and again at the police station, and each of them testified at trial. The police interviews of the children on the scene were recorded on the body cameras of the responding officers, Officer Halie Alexander and Sergeant Derek Moore. The subsequent interviews at the police station, during which each child identified the defendant from photographic lineups, were also recorded and introduced at trial. During the interviews, each of the children made statements consistent with their trial testimony and unequivocally stated "Juice Bentley" (the defendant) shot their mother.

Damien testified the defendant and his mother dated for about two or three months, but broke up before the shooting. He stated the defendant would always accuse his mother of cheating on him, although they were no longer together, and she was not dating anyone. When the defendant showed up at the house on the night in question, Damien heard him at the door but did not see his face. In addition to hearing the defendant's voice, Damien heard his mother say the defendant's name while speaking to him at the front door. Mullens told Damien to grab his brother's AK-47 rifle.[4] She kept the screen door closed and did not allow the defendant to enter the apartment, as she briefly conversed with him in the doorway. The defendant told Mullens he just wanted to talk and to let him in. Mullens told the defendant she did not want to talk to him and then closed the front door. Seconds after Mullens closed the front door, the children heard gunshots and saw Mullens fall to the floor.

---

[4] The eldest brother, Naquillas, left the residence before this incident to go to the bowling alley.

Although it was around ten or eleven o'clock at night, Breonta and Devonta testified the porch light was on when the defendant arrived and the shooting occurred. Breonta said she was standing in the kitchen doorway when she heard her mother tell Damien to get a gun, saw her mother close the front door, and then heard gunshots. She saw half of the defendant's face when her mother opened the front door and talked to him through the closed screen door. She testified, "[the defendant] started shooting through the door and then [her mother] fell to the ground." Devonta, who was sitting on the living room couch, similarly testified he was able to see the defendant's face as his mother talked to him through the closed screen door, and testified the defendant was alone outside. Devonta further said he saw what he believed to be a gun on the defendant's side. Devonta testified he saw his mother close the front door, adding, "[l]ike two seconds later [the defendant] shot through the door." He stated his mother then fell near the fish tank. Damien, Breonta, and Devonta all testified they were one hundred percent certain of their identification of the defendant as the person who shot their mother.

Further, all three of the children denied Damien fired the rifle while inside the house. Damien specifically testified he first called the police after the defendant fired into the house and his mother fell. He then went outside and fired his gun in the front and backyard, and then reentered the house. He testified that after police arrived, he told them he fired his rifle in the backyard but did not inform them he also fired his gun in the front yard because he was scared.

Detective Joshua Brogan of the BRPD Homicide Division conducted the investigation at the scene and testified at trial. Detective Brogan testified the front door appeared as though multiple projectiles passed through it from outside to inside. Detective Brogan confirmed the evidence indicated bullets were fired into the home from outside, further stating there was "no evidence to prove that the shot, any shot came from inside." Specifically, he testified the projectiles recovered from inside

7

the home appeared to be of a small pistol caliber, specifically a nine-millimeter caliber. He further observed wood splinters in the living room, consistent with shots being fired from the outside of the residence to the interior. Finally, no spent shell casings were found inside of the residence.

Corporal Chanta Beard, Corporal Julius Raymond, and Corporal Andrew DeSalvo of the BRPD Crime Scene Investigations Division responded to the scene and took photographs of bullet holes in the wooden front door and the metal screen door. Corporal Beard identified photographs showing the damage caused by bullets striking the metal door, the front door, a vase, a mirror frame, the wall, and the mail box. The officers also photographed and collected bullet fragments, projectiles, and casings. While projectiles and fragments were recovered inside of the residence, five nine-millimeter shell casings were recovered from the grass in the front yard, and two 7.62 by 39-millimeter shell casings were recovered from the backyard.

Consistent with Detective Brogan, Corporal Raymond testified no casings were found inside the home, only outside. Corporal Raymond and Corporal DeSalvo further confirmed that AK-47 rifles release shell casings when fired. Corporal DeSalvo testified AK-47 firearms are typically chambered for 7.62 by 39-millimeter casings, but it is not uncommon to see one chambered in other rifle calibers and in pistol calibers such as 9 millimeters chamberings.

Dr. Ann Van Vo, a forensic pathologist, performed the autopsy in this case. Dr. Vo testified Mullens' wounds were caused by one bullet which entered the outside of her right arm, exited the inside of her right arm, reentered through the right side of her chest, went through her liver, right lung, and heart, and exited the left side of her chest. Dr. Vo further testified that before entering Mullens body, the bullet traveled through another object such as heavy clothing or a door. Dr. Vo concluded it was more likely Mullens was shot with a handgun, as opposed to a rifle,

as a rifle would have likely caused more severe damage to a larger area of her torso. However, no bullets or fragments were recovered during the autopsy.

The defendant did not testify at the trial. On appeal, the defendant contends the State failed to prove his identity as the shooter who killed Mullens, suggesting Damien may have fired his weapon inside. We find the record does not support the defendant's arguments.

We note initially the defendant had a history of domestic abuse. Three eyewitnesses to the instant shooting testified at trial and consistently stated the defendant repeatedly called Mullens before showing up at the residence alone, armed with a gun. The evidence at the scene showed Mullens was shot from outside of the home. Damien testified he only fired his rifle outside, after his mother was shot by the defendant. His testimony was corroborated by Breonta and Devonta. Police testimony indicated AK-47 rifles ejected casings when fired and no casings were found inside the home, only outside. The projectiles and fragments found inside and the casings found outside were consistent with a small pistol being fired into the home, and a rifle being fired outside. The witnesses positively identified the defendant as the only person who fired a gun into the home, as Mullens was immediately struck by gunfire and fell to the floor. Further, the autopsy was consistent with Mullens being shot with a pistol, not a large rifle. Accordingly, a rational juror could have concluded the State successfully negated any reasonable probability of misidentification in this case.

Further, there was no evidence the defendant was provoked in any manner. Provocation testimony is an issue of credibility. Mere words or gestures will not reduce a homicide from murder to manslaughter. **Mellion**, 342 So.3d at 47; see also **State v. Charles**, 2000-1611 (La. App. 3rd Cir. 5/9/01), 787 So.2d 516, 519, writ denied, 2001-1554 (La. 4/19/02), 813 So.2d 420 (an argument alone will not be sufficient provocation to reduce a murder charge to manslaughter); **State v. Landry**,

2019-0486 (La. App. 1st Cir. 2/21/20), 297 So.3d 8, 13-14, 18. Inconsistent with sudden passion or heat of blood, a rational juror could have concluded that the defendant armed himself with a gun and traveled to the residence to confront and kill Mullens.

Under the facts and circumstances presented in this case, we cannot say that the jury was irrational in determining the defendant had the specific intent to kill Mullens and in finding the defendant failed to prove the existence of mitigating factors by a preponderance of the evidence. See **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). Viewing the evidence in the light most favorable to the prosecution, we find any rational trier of fact could have found the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator of the offense. Accordingly, the sole assignment of error lacks merit.

## PATENT ERROR REVIEW

On appeal, this court routinely reviews the record for error patent. Pursuant to La. Code Crim. P. art. 920(2), in conducting a patent error review, this court shall consider "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence."

Herein, the sentencing transcript shows that after the trial court imposed the sentence herein, it advised the defendant that he had "two years for postconviction relief." However, a defendant generally has two years "after the judgment of conviction and sentence has become final" to seek post-conviction relief. La. Code

10

Crim. P. art. 930.8(A). Thus, the trial court failed to properly advise the defendant of the prescriptive period for seeking post-conviction relief.[5]

Nonetheless, the trial court's failure to properly advise the defendant has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142-43, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Accordingly, this error is not reversible. Out of an abundance of caution and in the interest of judicial economy, we advise the defendant La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **Id.** at 1143.

## CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of the defendant, Dayvon Bentley. We further give notice to the defendant of the limitations period for seeking post-conviction relief.

**CONVICTION AND SENTENCE AFFIRMED.**

---

[5] The minutes indicate the defendant was properly advised regarding the two-year prescriptive period running from the "finality of the judgment of conviction and sentence." However, the sentencing transcript reveals the defendant was improperly advised, as detailed above. It is well settled that in the event of a discrepancy between the transcript and the minutes, the transcript prevails. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983); see also **State v. Johnson**, 2020-0679 (La. App. 1st Cir. 4/28/21), 2021 WL 1662420, *6 n.4 (unpublished), writ denied, 2021-00802 (La. 10/5/21), 325 So.3d 381.