991 So.2d 40 (2008)
STATE of Louisiana
v.
Larry HEBERT.
No. 2008 KA 0003.
Court of Appeal of Louisiana, First Circuit.
May 2, 2008.
*42 Richard J. Ward, Jr., District Attorney, Tony Clayton, Elizabeth A. Engolio, Assistant District Attorneys, Plaquemine, LA, for Appellee, State of Louisiana.
Frank Sloan, Louisiana Appellate Project, Mandeville, LA, for Appellant, Larry Hebert.
Before PARRO, KUHN and DOWNING, JJ.
DOWNING, J.
The defendant, Larry Hebert, was charged by grand jury indictment with one count of second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty. He moved to suppress all confessions or inculpatory statements, but the motion was denied. He waived his right to jury trial and, following a bench trial, was found guilty as charged. He moved for a new trial, but the motion was denied. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. He now appeals, designating two assignments of error. We affirm the conviction and sentence.

ASSIGNMENTS OF ERROR
1. The trial court erred and/or abused its discretion in denying the defendant's motion to suppress the confession.
2. The trial court erred in denying the defendant his state and federal constitutional rights to trial by jury without first obtaining a clear, knowing, *43 and voluntary waiver of his right to trial by jury.

FACTS
On July 17, 2006, the Iberville Parish Sheriffs Office (IPSO) investigated the homicide of the victim, Cynthia Hebert, on Church Street in Maringouin. The victim suffered over thirty stab wounds, including four fatal six-inch-deep wounds to her back. The knife used to kill the victim was never recovered.
While IPSO was still on the scene, the deputies were notified by the West Baton Rouge Parish Sheriffs Office that the defendant had "turned himself in." The defendant had blood on his tennis shoes, a sock, T-shirt, shorts, and pants. Subsequent testing of the blood indicated that the DNA profile of the blood was consistent with the DNA profile of the victim's blood with one in 25.7 trillion odds that the DNA had come from someone other than the victim.
IPSO transported the defendant from Port Allen to Plaquemine. The defendant was taken into an interrogation room, and IPSO Detective Blair Favaron advised him of his Miranda[1] rights, including the right to remain silent and that anything he said could and would be used against him in a court of law. The defendant indicated he understood his rights, and he signed a rights-waiver form. The form included the warnings:
"BEFORE YOU CAN BE QUESTIONED CONCERNING THE ALLEGED OFFENSE(S), YOU MUST UNDERSTAND AND WAIVE YOUR CONSTITUTIONAL RIGHTS. IF YOU DO NOT UNDERSTAND THEM, OR DO NOT WAIVE THEM, YOU CANNOT BE ASKED ANY QUESTIONS CONCERNING THE OFFENSE(S). YOU HAVE THE RIGHT TO REMAIN SILENT. IF YOU GIVE UP THE RIGHT TO REMAIN SILENT: A) ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN COURT."
The form also indicated that the defendant was forty-eight years old, had completed the ninth grade, and was interviewed between 8:38 p.m. and 8:45 p.m.
Detective Favaron and IPSO Detective Jose Anderson then began recording an interview with the defendant using a tape recorder. The defendant was advised of his Miranda rights and was asked to put his initials in "the yes box[.]" Detective Favaron stated, "Having been read these rights, you want to talk to us?" The defendant replied, "No." Detective Favaron asked, "You don't want to talk to us?" The defendant replied, "No." Detective Favaron told the defendant to initial "the no box." Detective Favaron questioned the defendant concerning whether or not he was taking any medications and whether or not he had been drinking. The defendant indicated he had drunk "a little VO and about two beers" at approximately 5:30 p.m. or 6:00 p.m. Detective Favaron testified the defendant appeared coherent and not drunk. Thereafter, the following exchange occurred:
[Detective]: Okay. Why did you turn yourself in?
[Defendant]: Why run?
[Detective]: Run from what sir?
[Defendant]: Why run from anything that you have done you be a man and stand up for whatever you done done. Or whatever didn't happen.
[Detective]: What did you do?
[Defendant]: I don't know. Tell me.

*44 [Detective]: No, what you think you done?
[Defendant]: I don't know what I done, tell me. I need to know what I did `cause right now I don't know what I done. I'm being honest with you. If you think I'm lying, I swear I don't what
[Detective]: What's your wife's first name?
[Defendant]: Cynthia.
[Detective]: How long have you been married?
[Defendant]: Huh?
[Detective]: How long you've been married?
[Defendant]: About seven years.
[Detective]: Do you know that she's dead?
[Defendant]: She's dead?
[Detective]: Let me ask you something: [y]ou say initially you wasn't going to talk to us. You want to talk to us and tell us what happened? What you know happened?
[Defendant]: All I know she came to my house.
[Detective]: Hold on, hold on, you gonna talk to us?
[Defendant]: No, this off the record.
[Detective]: Okay, that's fine. Okay, okay. That's off the record, okay. That's fine.
The defendant then stated that although he and the victim had been separated for three and one-half months, and she was living with another man, she still complained about the defendant having friends over to his house, and "today she came in with a lot of crap and that was it. Just couldn't take no more." The defendant claimed he scuffled with the victim after she took a knife from his kitchen drawer and hit him with her hand. He claimed he had to defend himself from the victim because she was bigger than he was, and so he hit her in the head with a pipe four or five times. None of the victim's injuries were consistent with her being struck with a blunt object, such as a pipe. He claimed he took the knife away from the victim while they wrestled, stabbed her with the knife a number of times, and left in the victim's truck. The defendant claimed he did not intend to kill the victim. The knife used to kill the victim was never recovered.
Doris Jones, the defendant's sister, testified that the defendant called her to his place of employment on July 17, 2006. When Jones arrived, she saw the defendant with one of her other brothers. Jones claimed that the defendant was upset and crying. He claimed he did not know what had happened to his wife. Jones also stated, however, that the defendant "knew he stabbed [the victim]." Jones indicated that the defendant claimed that the victim came to "the house," "they got into it, [the victim] grabbed the knife and they wrestled for it[,]" and the victim tried to stab the defendant.

MOTION TO SUPPRESS
In the first assignment of error, the defendant argues the totality of the circumstances surrounding the interrogation reveal that he did not have a full awareness of the right to remain silent being abandoned or the consequences of the decision to abandon the right.
It is well settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451. Additionally, the State must show that an accused making a statement *45 or confession during custodial interrogation was first advised of his Miranda rights. State v. Caples, 05-2517, p. 8 (La. App. 1 Cir. 6/9/06), 938 So.2d 147, 153, writ denied, 06-2466 (La.4/27/07), 955 So.2d 684.
The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. Whether or not a showing of voluntariness has been made is analyzed on a case-by-case basis with regard to the facts and circumstances of each case. The trial court must consider the totality of the circumstances in deciding whether or not a confession is admissible. Caples, 05-2517 at p. 9, 938 So.2d at 153.
In Miranda, the United States Supreme Court "promulgated a set of safeguards to protect the there-delineated constitutional rights of persons subject to custodial police interrogation. In sum, the Court held in that case that unless law enforcement officers give certain specified warnings before questioning a person in custody,[2] and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary." State v. Leger, 05-0011, pp. 12-13 (La.7/10/06), 936 So.2d 108, 124, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007), quoting Michigan v. Mosley, 423 U.S. 96, 99-100, 96 S.Ct. 321, 324-25, 46 L.Ed.2d 313 (1975).
The Miranda holding "protects an individual's Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere." Leger, 05-0011 at p. 13, 936 So.2d at 124, citing State v. Taylor, 01-1638, p. 6 (La.1/14/03), 838 So.2d 729, 739, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). Miranda does not require that a defendant exercise his right to remain silent by any particular phrasing. In fact, the Supreme Court in Miranda stated that if the individual "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Leger, 05-0011 at p. 13, 936 So.2d at 124, citing Taylor, 01-1638 at p. 6, 838 So.2d at 739. However, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. Mosley, 423 U.S. at 102-03, 96 S.Ct. at 325-26.
When a defendant exercises his privilege against self-incrimination, the validity of any subsequent waiver depends upon whether police have scrupulously honored his right to remain silent. The critical safeguard in the right to remain silent is the person's right to cut off questioning. "Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." Leger, 05-0011 at pp. 13-14, 936 So.2d at 124, citing Mosley, 423 U.S. at 103-04, 96 S.Ct. at 326.
*46 Whether the police have scrupulously honored a defendant's right to cut off questioning is a determination made on a case-by-case basis under the totality of the circumstances. Factors going into the assessment include who initiates further questioning, although, significantly, police are not barred from reinitiating contact; whether there has been a substantial time delay between the original request and subsequent interrogation; whether Miranda warnings are given before subsequent questioning; whether signed Miranda waivers are obtained; and, whether the later interrogation is directed at a crime that has been the subject of the earlier questioning. Leger, 05-0011 at p. 14, 936 So.2d at 125, citing Mosley, 423 U.S. at 104-05, 96 S.Ct. at 326-27.
Prior to trial, the defense moved to suppress all confessions or inculpatory statements. Following a hearing, the trial court denied the motion to suppress, noting that the jurisprudence distinguished between the right to an attorney and the right to remain silent, in that once a defendant requests an attorney, all questioning must cease, but a defendant was free to change his mind and decide to talk at anytime. The court found that the facts of the instant case indicated that the defendant never requested an attorney, but simply stated "no" when asked if he wanted to talk to the police. The court indicated the defendant subsequently changed his mind, and thus, questioning could continue.
There was no abuse of discretion in the trial court's denial of the motion to suppress the confession. In obtaining the defendant's "confession," the police did not engage in conduct which destroyed his confidence in his right to cut off questioning. The defendant remained in control of whether or not he would talk to the police. The record is silent as to what, if anything, the defendant told the police in West Baton Rouge Parish. In any event, under the totality of the circumstances presented herein, we find that when the defendant surrendered to the police with blood on his clothes, and apparently cooperated in the initial Miranda-rights waiver process, Detective Favaron did not act unreasonably in continuing to question the defendant to find out what had happened. After the defendant indicated he did not want to talk to the police, Detective Favaron asked him general questions concerning whether the defendant had taken any medications or whether he had been drinking. Asking the defendant why he "turned himself in" was a fair question, given the fact that the defendant surrendered himself in West Baton Rouge Parish. Before the defendant began discussing the crime, the police reminded him that he had initially stated he would not talk to them, and asked him if he now wished to talk to them. The defendant did not tell the police that he still did not want to talk to them. He also did not remain silent. At no point during the interview did he assert his right to counsel. Rather, he presented his version of the events "off the record." Thus, the defendant wanted to present an account of the incident to be used in his favor, but not against him. The entire interview with the defendant lasted only a few minutes, and the defendant's "confession" was actually self-serving testimony bolstering his defense at trial of self-defense or manslaughter. The police did not browbeat the defendant into making a statement. See Taylor, 01-1638 at p. 7, 838 So.2d at 740; compare Leger, 05-0011 at pp. 14-16, 936 So.2d at 125-26 (police "interrogation teams" used to question defendant during two-hour interview, during which no waiver-of-rights form was generated, while he repeatedly told the police that he did not want to talk about the offense).
*47 This assignment of error is without merit.

WAIVER OF RIGHT TO JURY TRIAL
In the second assignment of error, the defendant argues that the record does not indicate that the jury trial waiver was knowingly and intelligently made.
Both the United States Constitution and the Louisiana Constitution expressly guarantee a criminal defendant the right to a jury trial. U.S. Const. amend. VI; La. Const. art. I, §§ 16, 17. However, some criminal defendants may, pursuant to statute, waive this constitutionally guaranteed right, provided the waiver of the right is knowingly and intelligently made. La. Code Crim. P. art. 780(A). See State v. Brooks, 01-1138, p. 5 (La.App. 1st Cir.3/28/02), 814 So.2d 72, 76.
A valid waiver of the right to a jury trial must be established by a contemporaneous record setting forth an apprisal of that right followed by a knowing and intelligent waiver by the accused. Id. Waiver of this right is never presumed. See La.Code Crim. P. art. 780(A). Id. However, prior to accepting a jury trial waiver, the trial court is not obligated to conduct a personal colloquy inquiring into the defendant's educational background, literacy, and work history. Brooks, 01-1138 at p. 7, 814 So.2d at 77.
The right to a jury trial was validly waived in this case. The minutes of the defendant's arraignment on October 23, 2006, indicate that the trial court advised the defendant of his right to have or waive a trial by jury, and the defendant elected a trial by jury. The minutes of August 2, 2007, indicate that in the presence of the defendant and his attorney, the trial court granted a defense motion to waive the jury. The transcript of August 2, 2007, indicates that defense counsel advised the court that, after discussing the matter, he and the defendant believed it would be in the defendant's best interest to waive trial by jury. The court asked the defendant if defense counsel had explained the right to a jury trial to him. The defendant answered affirmatively. The court advised the defendant, "I want you to know that by waiving the jury trial[,] it means that I will be the judge and the only judge of your guilt or innocence." The defendant again answered affirmatively. The court further advised the defendant, "I am not making any deals; I'm not being predisposed in this manner to anyany huh verdict one way or the other. I will call it like I see it if this matter is tried before me, do you understand?" The defendant again answered affirmatively. The court further advised the defendant, "Chips fall where they may. So, anything that anybody has been telling you about these [sic] plea bargaining or that the judge might be leaning one way or not leaning one way, I can tell you right now in open court that is not true; this judge will call it like he sees it if you waive your right to jury trial, do you understand that?" The defendant answered affirmatively. The court then asked the defendant, "Okay. Understanding all that at this time do you wish to waive your right to a jury trial and be tried by a judge, myself?" The defendant answered affirmatively.
The trial transcript indicates that at the beginning of trial on September 11, 2007, in the presence of the defendant and his attorney, the trial court stated that the defendant had previously waived the jury. The defense offered no objection, but rather indicated it was ready to proceed.
This assignment of error is without merit.

REVIEW FOR ERROR
Initially, we note that our review for error is pursuant to La.Code Crim. P. art. *48 920, which provides that the only matters to be considered on appeal are errors designated in the assignments of error and "error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La.Code Crim. P. art. 920(2).
The trial court did not wait the required twenty-four hours after denial of the defendant's motion for new trial before imposing sentence. See La.Code Crim. P. art, 873. However, the issue was neither assigned as error, nor was the sentence challenged, nor does the defendant cite any prejudice resulting from the court's failure to delay sentencing. Thus, any error which occurred is not reversible. See State v. White, 404 So.2d 1202, 1204-05 (La.1981); State v. Augustine, 555 So.2d 1331, 1334 (La.1990). Moreover, Augustine is distinguishable due to the mandatory nature of the sentence in this case. See State v. Seals, 95-0305, p. 17 (La.11/25/96), 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), grant of post-conviction relief on other grounds affirmed, 00-2738 (La.10/25/02), 831 So.2d 828.

DECREE
For the foregoing reasons, we affirm the conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The warnings must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444, 86 S.Ct. at 1612.