STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2019 KA 0486

STATE OF LOUISIANA

VERSUS

CHRISTOPHER JAMES LANDRY

Judgment Rendered: **FEB 2 1 2020**

********

Appealed from the 21st Judicial District Court
In and for the Parish of Livingston
State of Louisiana
Docket No. 35816

The Honorable Jeffrey S. Johnson, Judge, Presiding

********

Scott M. Perrilloux                          Counsel for Appellee
District Attorney                            State of Louisiana
Gregory J. Murphy
Jeffrey J. Hand
Patricia P. Amos
Assistant District Attorneys
Livingston, Louisiana

Bruce G. Whittaker                           Counsel for Defendant/Appellant
New Orleans, Louisiana                       Christopher James Landry

********

BEFORE: HIGGINBOTHAM, PENZATO, AND LANIER, JJ.

**LANIER, J.**

The defendant, Christopher James Landry, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. He pled not guilty. After a hearing, the trial court denied the defendant's motion to suppress statements and evidence. After a trial by jury, the defendant was unanimously found guilty as charged. The trial court denied the defendant's motion for post-verdict judgment of acquittal and motion for new trial. He was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The defendant now appeals, assigning error to the trial court's denial of the motion to suppress regarding his second police statement and the motion for new trial regarding his claim that the verdict was contrary to the law and evidence. For the following reasons, we affirm the conviction and sentence.

## STATEMENT OF FACTS

During the early morning hours of June 5, 2017, Kayla Denham (the victim) left the apartment that she shared with her boyfriend, Harrison Schmidt, who was asleep when she left. When Schmidt woke up, between 7:00 a.m. and 8:00 a.m., he read a text message sent by the victim at 5:03 a.m. that morning, indicating that she was at 30709 Dunn Road in Denham Springs. In addition to providing her location, the text message stated, "Please don't fall asleep this is sketch." Schmidt, who was aware of the fact that the victim had in recent months began earning money by giving "sensual massages" to various clients, immediately called the victim, but her cell phone was off.

After calling the police and failing to locate the victim at the residence on Dunn Road, later that day Schmidt went back to the area with his friend Albert McCormick. At that time they discovered the victim's vehicle off of a private gravel road, Carey O'Neal Road, in a grassy area, approximately 500 feet away

2

from the residence on Dunn Road. Schmidt dialed 911 and flagged down Deputy Tyler Reine of the Livingston Parish Sheriff's Office (LPSO), who was patrolling the area at the time. Schmidt led Deputy Reine to the victim's vehicle and remained at the scene to answer questions, as other officers arrived. Deputy Reine looked into the vehicle, which was not locked at the time, and noted that it was unoccupied and that there was no evidence that a struggle occurred therein. Deputy Reine contacted the victim's mother, who confirmed that it was unusual for the victim to turn her phone off or otherwise avoid contact with Schmidt. Deputy Reine then instructed a dispatch operator to ping the victim's cell phone and to add the victim's name to a national database for missing persons.

Deputy Reine remained on the scene until Detective Randy Lipscomb of the LPSO arrived. After he was briefed, Detective Lipscomb called Detective Brandon Ashford, a LPSO K-9 deputy, for assistance, before going to the house on Dunn Road.[1] After talking to Eileen Talley, who was present at the home, Detective Lipscomb encountered the defendant and another resident Zachary Ingram. Detective Lipscomb told the defendant and Ingram that he needed to talk to them and asked the defendant to join him in his unit. The detective noticed that the defendant had scratches on his face and hands. The defendant indicated that he was in the process of moving in at the residence on Dunn Road. After being advised of his **Miranda**[2] rights, the defendant participated in an audio recorded interview in the police unit. The defendant indicated that he spent the night there, but did not see anyone arrive that morning. After the brief interview in the unit, Detective Lipscomb asked the defendant to accompany him to the sheriff's office, the defendant agreed, and waiver of rights forms were executed. As Detective

---

[1] The canine assisted the police in locating the victim's purse in a black garbage bag, approximately forty to fifty yards from her vehicle. "A dollar bill or so" was the only currency found in the victim's purse along with her Louisiana driver's license. The victim's body was subsequently found in the shed.

[2] **Miranda v. Arizona**, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

3

Lipscomb questioned the defendant about the scratches on his face, the defendant indicated that he tried to tame a cat, further stated that he had scratches on his body as well, and gave the officer permission to photograph his face and body. The defendant revealed multiple bruises and scratches on his upper body and legs. The defendant was then re-**Mirandized** and participated in a video and audio-recorded interview conducted by LPSO Detective Calvin Bowden.

In the second interview, the defendant described his first-time encounter with the victim in detail. He stated that he paid the victim when she first arrived and that she then provided a massage and other sexual acts. He indicated that after the encounter, he stepped out to urinate and when he returned, the victim was in possession of his bag of belongings, as she attempted to exit the room. The defendant told her to stop, but when she kept going, he grabbed an arm-length, hard, plastic object and struck her with it. According to the defendant, the victim then turned around, kicked him, and hit him with a folded chair. The defendant struck the victim again with the object in the head, put his hands around her neck, and began choking her after she kneed him in the groin. The victim fell, was non-responsive, and began breathing abnormally, as the defendant panicked. He picked her up and placed her body in a plastic tub located in the shed adjacent to the house on Dunn Road, and then relocated her vehicle off of the gravel road where it was discovered.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number two, the defendant argues that the trial court erred in denying the motion for new trial as the evidence only supported a verdict of the responsive offense of manslaughter.[3] The defendant first notes that the

---

[3] We note that the trial court's decision to deny the motion for new trial on the claim that the verdict was contrary to law and evidence required it to act as a juror and reweigh the evidence, which this court is constitutionally precluded from doing. **State v. Kitchen**, 2017-0362 (La. App. 1st Cir. 9/15/17), 231 So.3d 849, 864, writ denied, 2017-1983 (La. 11/14/18), 256 So.3d 281. An appellate court may review the ruling on a motion for new trial only for an error of law.

4

evidence at trial revealed that he was a simple man with meager possessions whose home had been flooded. He argues that under those circumstances, when he found the victim stealing all that he possessed, his rage was immediate, understandable, and justifiable. He contends that such a "provocative setting" would be sufficient to deprive the average person of self-control and cool reflection. The defendant claims that in the heat of that moment, he struck the victim and met her retaliatory blows with counter-blows until she tragically died. He argues that the crime which he admittedly committed was nothing more than manslaughter.

When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under **Hudson v. Louisiana**, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt, viewing the evidence in accordance with **Jackson v. Virginia**, in the light most favorable to the prosecution. See La. Code Crim. P. art. 821(B); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Hearold**, 603 So.2d 731, 734 (La. 1992).

The **Jackson v. Virginia** standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. In conducting the review under **Jackson v. Virginia**, we also must be expressly mindful of Louisiana's circumstantial

---

La. Code Crim. P. art. 858. Thus, to the extent that the defendant argues that the verdict was contrary to the law and evidence, the denial of his motion for new trial on that basis is not subject to review on appeal. See **State v. Hampton**, 98-0331 (La. 4/23/99), 750 So.2d 867, 880, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); **State v. Creel**, 2014-0680 (La. App. 1st Cir. 12/23/14), 2014 WL 7332121, at *4 (unpublished), writ denied, 2015-0151 (La. 11/20/15), 180 So.3d 316. However, we will consider the defendant's challenge of the evidence pursuant to **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). See also La. Code Crim. P. art. 821(B). We further note that the defendant has not attempted to show, nor do we find, any legal error in the trial court's denial of his motion for new trial.

evidence test, i.e., "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. R.S. 15:438. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Dyson**, 2016-1571 (La. App. 1st Cir. 6/2/17), 222 So.3d 220, 228, writ denied, 2017-1399 (La. 6/15/18), 257 So.3d 685; **State v. Morris**, 2009-0422 (La. App. 1st Cir. 9/11/09), 22 So.3d 1002, 1011.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the factfinder. **State v. Coleman**, 2017-1045 (La. App. 1st Cir. 4/13/18), 249 So.3d 872, 877, writ denied, 2018-0830 (La. 2/18/19), 263 So.3d 1155. Specific intent to kill or inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. **State v. Devillier**, 2017-572 (La. App. 5th Cir. 10/17/18), 258 So.3d 230, 252, writ denied, 2018-01855 (La. 10/8/19), 280 So.3d 589. Conversely, a defendant's confession is direct evidence, for it is an acknowledgment of guilt for which no inference need be drawn. **State v. Allen**, 41,548 (La. App. 2nd Cir. 11/15/06), 942 So.2d 1244, 1251, writ denied, 2007-0530 (La. 12/07/07), 969 So.2d 619. See also La. R.S. 15:449; **State v. Brown**, 2013-0560 (La. App. 1st Cir. 4/30/14), 2014 WL

2711808, at *4 (unpublished), writ denied, 2014-1418 (La. 9/18/15), 177 So.3d 1066.

Louisiana Revised Statutes 14:31(A)(1) defines manslaughter as a homicide which would be either first degree murder or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. "Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense, which exhibit a degree of culpability less than that present when the homicide is committed without them. The State does not bear the burden of proving the absence of these mitigatory factors. A defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. In reviewing the claim, the court must determine, viewing the evidence in the light most favorable to the prosecution, if a rational trier of fact could have found the mitigatory factors were not established by a preponderance of the evidence. **Morris**, 22 So.3d at 1009.

Deputy Reine testified that it was 3:50 p.m. on June 5, 2017, when Schmidt and McCormick led him to the victim's vehicle. Schmidt informed Deputy Reine that the victim was a massage therapist and that she had a 5:00 a.m. appointment at 30709 Dunn Road that morning. After looking inside of the vehicle, Deputy Reine questioned the occupants at the Dunn Road residence. Zachary Ingram, who identified himself as the homeowner, stated that he was not aware of anyone having an appointment there and allowed the deputy to enter the home to look around. As he walked through the residence, Deputy Reine saw the defendant, who, upon seeing the deputy, began to walk away from him. He subsequently saw another occupant, later identified as Jason Klein. After exiting the house, Deputy Reine spoke with Zachary Ingram, who identified the other occupants (the

7

defendant and Klein). Deputy Reine then went back to the vehicle on Carey O'Neal Road, called the victim's mother, and briefed Detective Lipscomb upon his arrival.

Talley, the resident who spoke to Detective Lipscomb when he arrived at the house on Dunn Road, testified that she heard a disturbance between 5:30 and 5:50 that morning. When she tried to leave later that morning, a blue car was blocking her in. She identified the victim's vehicle as the one that was blocking her vehicle. Talley confirmed that Keith Hull and Zachary Ingram lived at the residence, and that the defendant was Zachary Ingram's friend. After Detective Lipscomb spoke to Hull, he made contact with the defendant and Zachary Ingram.

While the defendant was evasive during the interview at the residence on Dunn Road, he provided the following factual account during his second police statement at the detective's office. He stated when the victim arrived, he immediately paid her over one hundred dollars for her services. They "hung out" for about an hour, in which time they engaged in sexual acts, but did not have intercourse. As to why the encounter became physical, the defendant claimed that he panicked when he saw the victim with his bag of belongings. He noted that the bag contained his wallet, computer, USB drives, and other items. He expressed regret and remorse for his reaction, but noted that he did not own much due to being a victim of the Louisiana flood of 2016. According to the defendant, when the victim ignored his order to stop, he grabbed the club-like object and struck her. The defendant further indicated that he hit the victim again after she became physical, as she hit him with a chair, kicked him, and kneed him in the groin. After the defendant repeatedly struck and strangled the victim, she fell and lost consciousness. The defendant stated that he panicked after the victim fell, as he noticed that "something was off." He "kinda freaked out" and relocated the

8

victim's body, purse and vehicle. The defendant confirmed that the fight was intense, but denied that the victim was screaming or hollering at the time.

That day, the LPSO obtained and executed a search warrant for the residence on Dunn Road. Mindy Buratt of the Louisiana State Police Crime Lab (LSPCL), an expert in latent print processing and crime scene investigations, processed the scene, including the victim's body, which was recovered from a large plastic container located in the shed. The victim had possible defense wounds on her arms. After photographing and processing the victim's body, Buratt processed the home, including the bedroom where the struggle took place and the bathrooms. She took photographs, noted the presence of suspected blood at the bottom of a door, the threshold of doors, doorknobs, the bathroom counter, and various areas on the floors, and lifted fingerprints. She further recovered the victim's car keys and clothing, sheets, and towels that had suspected blood on them. On the floor in the bedroom where the struggle took place, on the right side of the bed, Buratt located the club-like object[4] used by the defendant. She further photographed blood splatter located on the rear driver's side of the victim's vehicle. She testified that the results of latent print comparisons showed that the prints lifted from the doors, including bloody prints from the interior side of the French doors, matched the defendant's fingerprints.

The next day, June 6, 2017, after being allowed by the police to reenter the home, Michelle Collins, the owner of the home, recovered a bag of the defendant's belongings, informed the police, and stored the bag in a locked closet before releasing it to Detective Lipscomb on June 13, 2017. Detective Lipscomb sent the bag to the LSPCL for fingerprints and DNA testing. Detective Lipscomb further

---

[4] The object was described by Ingram as a Cold Steel brand Native American war club. Ingram testified that the object was a gift and that while he normally kept it at the foot of his bed, it was located in the back room, where the defendant was sleeping on the night before the incident. (R. 874-75).

9

obtained a search warrant for the defendant's phone and the victim's phone records. The victim's phone records showed that she had communications with the defendant June 5, 2017, between 4:51 a.m. to 5:47 a.m., regarding the appointment.

Dr. Karen Ross, an expert in forensic pathology and a deputy coroner at the East Baton Rouge Coroner's Office, performed the autopsy on the victim. She testified that the victim had multiple blunt force injuries, multiple lacerations on the left side and the back of her head, and there were at least fifteen impact sites ranging from approximately one-half to one and a half inches. The victim had numerous contusions and abrasions over her upper and lower extremities, chest, abdomen, and back. The victim further suffered lacerations of the scalp and subscalpular hemorrhage, indicating that she was alive when she sustained the injuries. There were also at least three depressed round fractures on the left side of her head, the back topside of her head and the outer part of the skull. She further had bruises on the brain underneath those areas where the skull was fractured and a layer of hemorrhage over the top of the brain and the base of the brain called subarachnoid hemorrhage. She had bruises and abrasions on both sides of her neck underneath her chin, a bruise and tear on the upper lip, contusions on her tongue, and hemorrhage at the base of her tongue, again indicating that she was alive when the injuries were sustained. Moreover, there were hemorrhages on every layer of muscles in her neck. She had a fractured hip without the presence of hemorrhaging, indicating that it was most likely a postmortem injury.

The toxicology results showed that she had cocaine, oxycodone, diazepam, and marijuana in her system. Dr. Ross testified the victim may have ingested the cocaine within forty-five minutes of her death, specifically noting that the half-life is fairly short and that the victim had the active metabolite in her blood at the time of death. Due to the fairly high level of oxycodone, Dr. Ross further assumed that

10

it had been ingested fairly recently. The victim's cause of death was blunt force injuries of the head, associated with strangulation. The victim weighed ninety-eight pounds.

Andrew Ingram, a LSPCL expert in DNA analysis, also testified at trial. Andrew Ingram noted that his analysis showed that the defendant could not be excluded as a DNA contributor of DNA samples removed from the victim's fingernail scrapings. He further examined samples taken from the club weapon and confirmed that the victim could not be excluded as the major contributor of the DNA obtained from the swab of the unstained areas of the club. The defendant and all male individuals within his biological paternal lineage could not be excluded as the major contributor to the male DNA profile obtained from the swab of the unstained areas of the club. The defendant was further an assumed contributor to the DNA profile taken from the exterior of the carry bag, and there were no conclusions in regards to another minor contributor. Thus, the victim's prints or DNA were not determined to be on the bag.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the mitigatory factors were not established by a preponderance of the evidence. Despite the defendant's account, there was no other evidence to show that the victim was attempting to steal the defendant's items. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. **Coleman**, 249 So.3d at 878. Moreover, even assuming that she had touched the defendant's belongings, we find that rational triers of fact might well have concluded that the defendant was not provoked in such a manner to deprive the average person of self-control and cool reflection.

The record, including the defendant's own statements, the victim's multiple injuries, and the processing of the crime scene, shows that the victim was brutally beaten and strangled to death by the defendant. We cannot say that the jury's

unanimous determination was irrational under the facts and circumstances presented to them. See **Ordodi**, 946 So.2d at 662. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the jury and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Mire**, 2014-2295 (La. 1/27/16), 269 So.3d 698, 701; **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). After a thorough review of the record, viewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder. Thus, we find no merit in assignment of error number two.

## MOTION TO SUPPRESS CONFESSION

In assignment of error number one, the defendant contends that his second recorded statement to the police should have been suppressed. The defendant specifically claims that during the second interview he attempted to ask questions about the exercise of his right to counsel, but before he could enunciate the words, Detective Bowden interrupted him and continued the interrogation. The defendant contends that his "fumbling effort" to seek advice of counsel should have been honored. He claims that Detective Bowden discerned an inkling of the defendant's desire to exercise his right to counsel and denied the defendant his right by refusing to let him speak on the issue. He argues that he was prevented from unequivocally requesting the presence of counsel. He concludes that the error of the trial court in denying the motion to suppress mandates reversal and remand for a new trial.

A trial court's ruling on a motion to suppress the evidence is entitled to great weight, because the court had the opportunity to observe the witnesses and weigh

12

the credibility of their testimony. **State v. Jones**, 2001-0908 (La. App. 1st Cir. 11/8/02), 835 So.2d 703, 706, <u>writ denied</u>, 2002-2989 (La. 4/21/03), 841 So.2d 791. Correspondingly, when a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. <u>See</u> **State v. Green**, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a trial court's legal findings are subject to a de novo standard of review. <u>See</u> **State v. Hunt**, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on the defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. **State v. Chopin**, 372 So.2d 1222, 1223 n.2 (La. 1979).

In **Miranda v. Arizona**, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court found that if a suspect indicates "in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." **Edwards v. Arizona**, 451 U.S. 477, 481-485, 101 S.Ct. 1880, 1883-1885, 68 L.Ed.2d 378 (1981), confirmed these views and, to lend them substance, held that when an accused either before or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation, even if he has been advised of his rights. The accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police.

When an accused invokes his **Miranda** right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: did the accused initiate further conversation or communication; and was

13

the purported waiver of counsel knowing and intelligent under the totality of the circumstances. **State v. Jefferson**, 2018-0083 (La. App. 1st Cir. 9/24/18), 261 So.3d 793, 799, writ denied, 2018-1671 (La. 2/25/19), 266 So.3d 294. See also La. R.S. 15:452 (no arrestee "shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime."). It is inconsistent with **Miranda** and its progeny for the authorities, at their insistence, to reinterrogate an accused in custody if he has *clearly* asserted his right to counsel. **Edwards**, 451 U.S. at 485, 101 S.Ct. at 1885 (emphasis added). Inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally initiate a conversation in the sense in which the word was used in **Edwards**. However, questions by the defendant about what is going to happen to him evince a willingness and a desire for a generalized discussion about the investigation, rather than merely being necessary inquiries arising out of the incidents of the custodial relationship. **State v. Smith**, 2008-0576 (La. App. 1st Cir. 9/12/08), 2008 WL 4191504, *7 (unpublished), writ denied, 2008-2640 (La. 09/04/09), 17 So.3d 956.

The **Miranda** right to counsel is a prophylactic rule that does not operate independent from the danger it seeks to protect against, i.e., the compelling atmosphere inherent in the process of in-custody interrogation, and the effect that danger can have on a suspect's privilege to avoid compelled self-incrimination. See **Miranda**, 384 U.S. at 478, 86 S.Ct. at 1630. The applicability of the "'rigid' prophylactic rule" of **Edwards** requires courts to "determine whether the accused actually invoked his right to counsel." **Davis v. United States**, 512 U.S. 452, 458, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (quotation omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. **Davis**, 512 U.S. at 458-59, 114 S.Ct. at 2355. Invocation of the **Miranda** right to counsel "requires, at a minimum, some

14

statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." **Davis**, 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, the cessation of questioning is not required. The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. **Id.**

When the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning would transform the **Miranda** safeguards into wholly irrational obstacles to legitimate police investigative activity. **Davis**, 512 U.S. at 460, 114 S.Ct. at 2355-56 (citation omitted). In **Davis**, the United States Supreme Court indicated it would often be good police practice for interviewing officers to clarify whether or not a suspect actually wants an attorney present in those situations where the suspect makes an ambiguous or equivocal request for counsel. However, the Court expressly declined to adopt a rule requiring officers to ask clarifying questions. **Davis**, 512 U.S. at 461-62, 114 S.Ct. at 2356.

In analyzing whether there has been a direct, clear, unequivocal, and unambiguous request for counsel, courts must give a broad, rather than narrow, interpretation to the suspect's request. **State v. Payne**, 2001-3196 (La. 12/4/02), 833 So.2d 927, 936. For example, in **Davis**, the United States Supreme Court found that the statement "Maybe I should talk to a lawyer" was not an unequivocal request for counsel. **Davis**, 512 U.S. at 461-62, 114 S.Ct. at 2356-57. In **State v. Leger**, 2005-0011 (La. 7/10/06), 936 So.2d 108, 135, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007), the Louisiana Supreme Court found the statement, "I know I need to see one [a lawyer]" did not amount to an
15

unambiguous request for counsel that would indicate to a reasonable police officer that the defendant was asking for counsel at that time. Additionally, in **State v. Chesson**, 2003-0606 (La. App. 3d Cir. 10/1/03), 856 So.2d 166, 175, writ denied, 2003-2913 (La. 2/13/04), 867 So.2d 686, the court found that the defendant's statement regarding his "thinking" that he possibly "should" speak with an attorney is not the type of unequivocal and unambiguous statement described above.

Herein, as Detective Lipscomb testified at the motion to suppress hearing, the defendant was first advised of his **Miranda** rights before the interview in the police unit at the Dunn Road residence. Specifically, he was informed of his right to remain silent or to answer questions. He was also informed that anything he said could be used against him in court. Further, he was advised of his right to talk to a lawyer for advice before answering questions, that he may have a lawyer with him during questioning, that if he could not afford an attorney one would be appointed, and that if he decided to answer questions without a lawyer present, he would still have the right to stop answering at any time to seek assistance of counsel. Detective Lipscomb further testified that the defendant did not have any questions, that he seemed to understand his rights, and that he did not request an attorney.

After the brief interview in the police unit, Detective Lipscomb took the defendant to the detectives' office for additional questioning. While Detective Lipscomb was present, the interview at the detectives' office was conducted by Detective Bowden. As Detectives Lipscomb and Bowden testified at the hearing, the defendant was again advised of his **Miranda** rights and executed a waiver of rights form. The defendant indicated that he had a high school level education. The detectives testified that the defendant, once again, seemed to understand his rights.

As the defendant notes on appeal, there were four instances during the interview when the defendant made statements that he did not complete, as he was interrupted and/or paused just as questioning continued. Specifically, just prior to eight minutes into the interview, Detective Bowden stated, "Like I said I'm shooting you straight. And I want you to shoot me straight, and I want you to tell me when that girl came over there this morning Okay." The defendant replied, "Yes sir, um. The only thing I'd ask I'd ask is if I [slight pause]." At that point, Detective Bowden continued, "Because look, this is the thing ... let's say that there's a canvas on this wall, right here ... that canvas is going to be shown to the whole world ... You tell me what happened and I can put your story on the portrait." The detective added, "Because I can assure you if I have to come out what I think happen[ed], it's probably not going to be as nice as what really happened....I would have to paint the picture and it would be a bad picture." When asked if he planned the incident, the defendant replied, "No sir."

The second statement by the defendant referenced on appeal occurred nearly fifteen minutes into the interview, as Detective Bowden then asked, "Did it just happen?" The defendant replied, "I understand, I understand... I have no problem answering everything, I just want to... [inaudible]." Detective Bowden interrupted as follows, "Listen to me, listen to me." The defendant replied, "Yes sir." Detective Bowden added, "If you didn't plan it, it ain't premeditated, okay." After Detective Bowden noted that there was two possibilities, first that the defendant was a monster and second the defendant actually had regret and sorrow and made a mistake, the defendant indicated that it was the second scenario. The detective indicated that he could only paint that picture on the canvas if the defendant told him what happened.

At that point, the defendant made the third statement noted on appeal as follows, "We don't have time for this one for me to try to talk to ... [inaudible]."

17

Detective Bowden interjected, stating, "I just need you to tell me now what happened, I want you to tell me your side of the story. I don't want to paint you as a monster." Detective Lipscomb added, "You need to help yourself out here Chris." The defendant then made the final statement asserted on appeal as an attempt to request counsel as follows, "It's, it's not that that I'm worried about sir, I have no problem telling ya'll the truth, I just don't..." Detective Bowden replied, "Listen to me, think about her parents, think about her parents right now." At that point, the defendant began his detailed account of what happened that morning. At the end of the over forty-minute interview, after fully confessing to beating the victim to her death, Detective Bowden asked the defendant if he was pleased that he provided his account of the incident. The defendant replied, "Yes sir, the only thing that I was worried about is that I don't ... and then everything I've ever heard is that don't say anything unless you have somebody, a counsel. I mean, I mean I ain't say[ing] that but at that point, I'd rather...." At that point, Detective Bowden acknowledged the defendant's mention of an attorney and ceased questioning.

In denying the motion to suppress, the trial court noted that it listened to and viewed the interview and found that the confession was in compliance with **Miranda**. We agree, as there was simply no statement prior to or during his confession that could be interpreted as a direct, clear, unequivocal, and unambiguous request for counsel. The defendant's only request came after his full confession, at which point the interview was immediately ceased. We disagree with the defendant's contention that four interruptions, during an over forty-minute interview, prevented him from unequivocally asking for an attorney. There is no evidence of threats, promises, pressure, duress or coercion of any kind that would obviate the voluntariness of the defendant's confession. Considering the foregoing, we find that the trial court did not err or abuse its discretion in denying

the defendant's motion to suppress the confession. Thus, we find no merit in assignment of error number one.

## PATENT ERROR

This court routinely reviews criminal appeals for patent error. Our review has revealed the existence of a patent sentencing error in this case, as noted in the defendant's brief on appeal. The record reflects that the defendant's motion for new trial and motion for post-verdict judgment of acquittal were filed on November 2, 2018, and denied at the sentencing hearing on November 26, 2018, immediately before the sentence was imposed. Louisiana Code of Criminal Procedure article 873 mandates that a sentence shall not be imposed until at least twenty-four hours after a motion for new trial, or in arrest of judgment, is overruled, unless "the defendant expressly waives" the required delay. In this case, there is no indication in the record the defendant waived the delay. Accordingly, the trial court erred by sentencing the defendant immediately after denying the motion for new trial and motion for post-verdict judgment of acquittal.[5] Nevertheless, in **State v. Augustine**, 555 So.2d 1331, 1333-34 (La. 1990), the Louisiana Supreme Court indicated that a failure to observe the twenty-four hour delay provided in Article 873 will be considered harmless error where the defendant could not show that he suffered prejudice from the violation. See **State v. White**, 404 So.2d 1202, 1204-05 (La. 1981). In **Augustine**, the Supreme Court concluded that prejudice would not be found if the defendant had not challenged the sentence imposed and the violation of the twenty-four hour delay was merely noted on patent error review. **Augustine**, 555 So.2d at 1334. In the instant case,

---

[5] While a motion for post-verdict judgment of acquittal is not listed in La. C.Cr.P. art. 873, this court previously has applied the twenty-four hour delay required by Article 873 to motions for a post-verdict judgment of acquittal. **State v. Wilson**, 526 So.2d 348, 350 (La. App. 4th Cir. 1988), writ denied, 541 So.2d 851 (La. 1989) ("[Article] 873 refers to both motions for a new trial and in arrest of judgment when it requires the twenty-four hour delay. Thus, the trial court's failure to delay after denying ... a motion for post-verdict judgment of acquittal should be analogously treated.").

the issue was neither assigned as error, nor was the sentence challenged, nor does defendant cite any prejudice resulting from the court's failure to delay sentencing.

Moreover, the trial court lacked sentencing discretion in this case. The defendant received a mandatory sentence of life imprisonment at hard labor. See La. R.S. 14:30.1(B). Accordingly, any error in the trial court's failure to observe the twenty-four hour delay is harmless beyond a reasonable doubt and does not require a remand for resentencing. See **State v. Seals**, 95-0305 (La. 11/25/96), 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); **State v. Hebert**, 2008-0003 (La. App. 1st Cir. 5/2/08), 991 So.2d 40, 48, writs denied, 2008-1526 (La. 4/13/09), 5 So.3d 157 & 2008-1687 (La. 4/13/09), 5 So.3d 161.

**CONVICTION AND SENTENCE AFFIRMED.**